Morning your honor, how are you? I'm good, how are you? I'm Paul Eaglin from Fairbanks, Alaska, here to represent Ruth Shuey in this case from the District of Montana and I would like to thank you very much for hearing my client's case. As we know, just last week we had the Molina case come out and despite all of our briefing here, what I would like to do, if it's alright, is to try to address Ruth Shuey's case from the standpoint of Molina. I think that's an excellent idea. Thank you, yeah, because who knows what's going to come of that. I mean, we have two circuit judges split on that and there's probably going to be more action, I suspect, perhaps even by a full court. And so what I would like to suggest to you is that even under the Molina standard, that the errors that, and I will talk about a central one that I think would be important here, even under the Molina standard, the error would not be inconsequential to the ultimate non-disability determination and therefore would not be harmless error. If you would keep in mind, at the end of the hearing, there's a colloquy between the counsel for Ruth Shuey and the vocational expert. And the vocational expert says, in response to questions, that even at sedentary RFC, residual high school, functional capacity of sedentary, absences will be disqualifying. Well, that makes sense. Nowadays, especially, vocational experts at hearings nowadays testify that even minimal absences are disqualifying because there's so much, so many people looking for jobs. But even at sedentary, absences would be disqualifying. It's at the very end of the hearing. And so, as we know, Ruth Shuey has migraines. They're episodic. We know that migraines are, I don't have them, but we understand that they're episodic and unpredictable, for the most part, and she attests to that. So, that is part of the way along the path of showing that she would, even with sedentary employment, have absences that would be disqualifying. She even points to and offers testimony from Colin Thompson, who corroborates her own testimony that she has difficulty, because of her migraines, of working in even a sedentary type of volunteer work that she was doing at her VFW post. Her own credibility was discounted. We would contend, of course, improperly to the extent that the VA commander, Colin Thompson's statement, or to the extent of his uncontradicted statement, because he says exactly what she is contending, that she cannot work consistently eight hours a day, five days a week, week in, week out. Well, apparently... Go ahead. Wasn't Mr. Thompson's statement simply cumulative of her own expression of her pain? I would agree it's cumulative, as I said in the reply brief, but I think the importance is this. Even if it is cumulative, because her own testimony was so subjected to question, she was doubted so much that where we have a clean witness, such as Colin Thompson, that should be important. Yes, it's cumulative. Yes, it's corroborative, but it's still important because it's fresh eyes, a clean witness, who says that he observed what she has already attested to. Well, based upon her own statements. Right. All right. Well, she... You know, that means your time is limited. What about, I want to go deer hunting tomorrow. What about that statement? Right. And that, I think, is, to some extent, I think that's dealt with unfairly, because in a contradictory way. One, it's considered as part of the residual functional capacity in terms of her abilities. Well, but what is wrong with the ALJ believing that if she, that she could do more activity than she was claiming if she goes to the hospital on whatever, after taking six pills of something or whatever the situation was. They keep her overnight, but she says, well, hey, I've got to get out of here because I'm going to go deer hunting. And deer hunting means you've got to go, you've got to carry a rifle, you've got to hike, you've got to do that. So why can't the ALJ say, well, hey, if you were going to go deer hunting, maybe you can do a little more than you're saying. And I think it's inconsistent because if I over-medicated with whatever it takes to knock me out to the extent of nearly killing me, I don't think people should take seriously what I say. But that's not really, the evidence doesn't really show that. I mean, when she took six pills of what? Amitriptyline, Your Honor. Is that her blood pressure medication or what was it? Oh, boy. I don't... You got me there. But it doesn't... You got me there. Yeah, but, I mean, she didn't almost die. The other thing about it, no matter what kind of medication it is, we don't know how Ruth Shuey would respond to amitriptyline. I mean, each of us took amitriptyline. We might react differently. You might be talking about going to the moon. I might want to go deer hunting and you might want to go knitting. So you're saying that was probably a result of her medication and she thought she could go deer hunting? I think there's certainly a sufficient basis for that or at least we ought to be careful about taking seriously what somebody has said who's just over-medicated to the point of nearly killing herself. So, on the one hand, you have them taking that seriously as if she really could go deer hunting. But, as I said in the brief, it's also unfair because it's completely taken out of context because she was saying that at a time when, apparently, her husband was nearby. Once he got out of the room, then they said that she was less coy than she had been and she was more open with him about it being a cry for help. Well, if it's a cry for help, that signifies depression to some extent. So why isn't this just all part of the credibility assessment? When you have someone in front of you, you've got a bunch of people that have had contact with the person, you have certain statements that you just throw it all in the pot and make a decision from there. Sure, it is part of the credibility assessment and that's why I think that it is important that Colin Thompson's statement went uncontradicted and yet he, not subjected to the type of credibility discounting, as with Ruth Chewy, is essentially saying the same thing. Yes, it's cumulative but it also is probative of somebody who is a clean witness who observed. The ALJ read the letter, right? I'm not sure. It's part of the evidence. Well, that's true. I would agree with that. We have to make that assumption. So you're saying that the ALJ didn't comment on it, right? It's not commented on. Alright, but I think we have to assume on this record that the ALJ took it in. So why doesn't Molina work against you in terms of that the ALJ, the failure when you hear all of this evidence, the fact that you don't comment on something but it was in fact received, why doesn't Molina show that it would be harmless? Allow us to come to that conclusion. I don't believe that Molina should result in that because I think in the type of circumstance we have that you ought to not follow Molina but instead Stout, the reason is because Colin Thompson is a clean witness who is not subjected to the type of discounting of credibility as to Ruth Chewy. And so there ought to be given credibility to his statement as an uncontradicted statement. Well, so he's a letter, right? He's not really, it's a letter, right? Sure. Okay. So you give the letter whatever weight you think that, I mean you're elevating it on one hand that he, you know, that the President of the United States came in and testified at her hearing and that, I mean, it's a letter, so. But the letters are often accepted as weighty as testimony and even under Stout we were talking about letters there, so. May I ask you another question? The Commissioner argues that you waived the argument that the ALJ erred in failing to articulate the technique for evaluating mental impairments and for failing to find that Chewy's depression was severe. Your reply brief did not respond. Are you conceding that this issue was waived? No, Your Honor. The Commissioner cites Greger, the Greger case from 2006, but quotes part of it which is that, to prevent manifest injustice, but the other part of Greger, which actually was a ruling against a claimant, but it talks about the circumstances in which a case or an argument may be accepted, even under these types of circumstances, one of which is where there's intervening case law. The decision out of the District of Montana was early 2011. Kaiser came out last summer. And so I dealt with Kaiser at the time I was briefing as in the Greger type of thing. I should have addressed it. I apologize for not doing so and I should have. Under Greger, I would say that it still should have been accepted under the Greger standard for accepting arguments that were not addressed. So by not responding, you were not waiving? Yes, Your Honor. May I reserve the remainder of my time, Your Honor? I just have one quick question about the mental, severe mental limitation. It seems to me that you're challenging that the ALJ, you're stating that the ALJ erred by not finding such a limitation at Step 2. But I'm having trouble in the record finding where, when, if ever, Ms. Shuey asserted before the ALJ that she had a severe mental limitation, whether she, I'm not finding medical or psychiatric diagnoses to support that assessment. And if she didn't make that assertion, how can we find that the ALJ erred? And because I believe that under the Kaiser standard, if the tolerable mental impairment would be the combination of Robert, even though he's a nurse practitioner and he was determined not to be an acceptable medical source, his notation does indicate depression as one of the things bothering her, plus a suicide attempt. That certainly is signifying of depression. It's one of the, probably the ultimate signification of depression. And so I think under those two in combination ought to be sufficient to provide... So we should have Sue Esponte made that finding at Step 2, even though you didn't assert it? Yes, Your Honor. Yes, Your Honor. Okay. All right. You can reserve the balance. Thank you. Good morning. Good morning. May it please the Court. My name is Alan Berger and I represent the Commissioner of Social Security, Michael Astrup. The Court hit on all the issues that plaintiff raised in the, I think Molina is a very important case as the Court recognized. And the question in Molina was, what do we do with an ALJ who doesn't appropriately address a lay witness testimony? And that's exactly the case that we have here. It's just on all points, Your Honor. Okay. So you're talking about the Thompson letter or what are you talking about? I am talking about the Thompson letter. Okay. You seem to argue that the ALJ need not discuss the Thompson letter because it supported Ms. Shuey's complaint. Well, when will corroborating evidence ever be important under that theory, if we accept your theory on that? Your Honor, if it exactly tracks what the plaintiff says, as this letter does, then it's corroborative and the reasons, the Court can follow the reasoning of the ALJ to conclude that the ALJ... Anyone that's ever done jury work knows that if, let's say, the alleged victim of a crime testifies a certain way, if you put witnesses that say the exact same thing as the alleged victim, it's a lot more likely that the jury is going to believe the alleged victim if you put on corroborating evidence, right? So if we accept your theory that corroborating evidence that supports what the claimant says is just not relevant because it only adds to it, it would never be relevant. Your Honor, I... It kind of defies how we evaluate evidence. I mean, obviously, the more that we pile on a lot of times, the more likely it means that someone's telling the truth. The Commissioner is not asserting that the testimony from Mr. Thompson wasn't something that needed to be considered and there's no evidence that the ALJ did not consider it. And the Commissioner is not... Under clearly established case law in the Ninth Circuit, the ALJ had a duty to discuss and give germane reasons for finding that that particular statement was not credible and he did not do so here. So, but for Molina, would this have to go back? Because you didn't... Because Molina came out after you briefed it and you still contested it. Yes, Your Honor. I think it would have to go back. I hate to... You know, I hate to cross-examine you that way, but it's... But you're exactly right, Your Honor. No matter what happened, under the rules that were set forth in Stout and also in the Supreme Court's case of Sanders... Schmickes v. Sanders, it would have to... The court would have to look and determine whether the ALJ's decision and the failure to address a lay witness testimony was harmless error. And in this particular case, the court would go through exactly the same kind of analysis that Molina went through, whether we had Molina or not. Okay. So you're saying Molina just gave you another arrow in your quiver. Yes, Your Honor. And a pretty good arrow at that. Okay. So under Molina, there was harmless error in the case when the ALJ did not address the testimony. And the key part of the statement from Mr. Thompson is that everything that he talked about, Shuey also mentioned. So if you take Shuey's credibility... the assessment of Shuey's credibility as good in proper analysis from the ALJ, then it carries over to Mr. Thompson's. And you find that Mr. Thompson's statement and the failure to address it was inconsequential to the ultimate non-disability determination, as the Molina court found. And frankly, given what the ALJ found about Ms. Shuey's credibility and about the evidence in there, in the entire file, there's no way any reasonable ALJ could have found that Mr. Thompson's testimony was credible. Next, I'd like to move over to the deer hunting incident and exactly what happened, because I'm not sure it was characterized right. There was an overdose of medication, and Ms. Shuey goes into the emergency room. And the first thing she says to the doctor when she goes into the emergency room is, When can I get out of here? I need to go deer hunting. And then the doctor says, Now, if I said that, I would be crazy, because I don't want to go. I would go with the appellant's lawyer, because I don't want to go deer hunting. So that's what he's arguing. You can't trust someone. That may be correct. That may be one interpretation that you can have, but it's not the only interpretation you can have. In the ALJ, it's the ALJ's duty to interpret the evidence. So if the ALJ's interpretation of the evidence is reasonable, the court should accept it. And what Ms. Shuey is asking the court to do is to reweigh the evidence to show that she's crazy because she wants to go deer hunting. You could say that, but the ALJ chose not to, and the court shouldn't question what the ALJ did. But it's supported by even more. What was her testimony at the hearing about the deer hunting? I don't believe she testified about the deer hunting. I'm not exactly sure you are. I can look if you... That's all right. Okay. But it goes further, because the doctor wanted to talk to her about why she overdosed, not whether she wanted to go deer hunting, which is something that the doctor should want to do. And before her husband left the room, she was coy, as the doctor puts it. After her husband left the room, she explained that she was having problems, personal problems and marital problems. It wasn't after her husband left the room she said she didn't want to go deer hunting. The deer hunting incident was totally separate from the coyness in the explanation. And further, the next morning when she's about to be discharged, again she says she wants to go deer hunting. There's no evidence where her husband was at that point. So, and the doctor said, you know, maybe you shouldn't, because we don't want you to be around firearms until you talk to your counselor. And that is what the deer hunting incident was. I think based upon that evidence, the ALJ had a reasonable basis for finding that she wanted to go deer hunting. The government will also point out that it's a little bit confused how plaintiff is arguing this deer hunting incident. Plaintiff is arguing that deer hunting was used by the ALJ to show that she didn't have a mental impairment. But really what the deer hunting incident was, was another incident going toward what activities that she could perform. Let me just check. Judge Heck, did you have a question? No, I didn't. I'm sorry. It was coffee. Oh, all right. It's with the video. I just wanted to make sure you didn't have a question. Okay, go ahead. Sorry. So it was with the activities that she was engaged in that the judge was worried about. Whether this was a suicide attempt or not is really irrelevant to the activities question. While on the other hand, it may be relevant to the question which comes up next, is whether Shuey had a colorable claim of a mental impairment. There are two stages to deciding whether she had a colorable mental impairment. The first one is, did she have a mental impairment at all? And the ALJ never found she had a mental impairment. The ALJ did say she was being treated for depression and anxiety, but never that she had a diagnosed mental impairment. Well, I think the petitioner is faulting the ALJ for not making that determination at step two. And my question was, did they even assert it? They did not, Your Honor. Now there is an opinion from a non-acceptable medical source, a nurse practitioner. However, the ALJ gave germane reasons for finding that that opinion was not entitled to much weight. Therefore, unlike the Kaiser case, there is no colorable claim of mental impairment. Blanf doesn't even allege what limitations, if any, she has from her mental impairment. So that's the first thing, you have to find a mental impairment, and there's no evidence of a mental impairment. The second thing is, even if you find a mental impairment, you have to find that the mental impairment lasted for 12 or more months. So that gets back to the deer hunting incident and the time she went in for the overdose of medication. There's no indication that even if this particular incident was severe enough to make a mental impairment a severe impairment, that it lasted for 12 months. It was an isolated incident on one or two days, and there's no evidence that before or after, her mental impairment was as bad as it was on that one day, assuming it was bad on that one day. So you miss both of the things that you need. You need a diagnosed mental impairment that causes limitations, and those limitations need to last for 12 months. And as the commissioner pointed out in the brief, the issue was waived. Appellants claim that without Kaiser, they didn't have any guidance. However, Kaiser clearly relied upon Gutierrez, which was decided many, many years ago. So the issue was in the Ninth Circuit and was something that a claimant could have raised. This is not a case where there is a manifest injustice. And Black's Dictionary defines manifest injustice as a direct, obvious, and observable error in a trial court, such as a defendant's guilty plea that is involuntary or is based on a plea agreement that the prosecution has rescinded. That's not what we have here. This is a case where a plaintiff could have raised this at the trial court. Appellant did not, and therefore, it is waived. Finally, we get to the – well, we've gotten – we started with the lay witness statement from Mr. Thompson. There was a little discussion of the statement by Mr. Shuey, but the ALJ gave germane reasons for discounting that. It was inconsistent with the evidence and was based on subjective complaints. And going back to Molina, those are exactly the same reasons why Mr. Thompson's opinion would not be entitled to much weight. And had the ALJ actually addressed Mr. Thompson, no reasonable ALJ would – given this ALJ's decision and this record, there's no reason that the ALJ would have given any weight to Mr. Thompson's statement. Basically, this is a case where Ms. Shuey is claiming that her migraine headaches are causing her significant absences from work. This case is about Ms. Shuey's subjective complaints. This case is about Mr. Shuey saying, this is what my wife's migraine headaches cause. This is Mr. Thompson saying, this is what Ms. Shuey's migraine headaches cause. Everything, the whole key to the case is Ms. Shuey's credibility. And other than maybe addressing it with a deer hunting incident, appellant does not question the ALJ's credibility assessment. That's the key to the case. Given that the credibility assessment by the ALJ was proper and supported by substantial evidence, the court should find that no reasonable ALJ could have reached a different disability determination, even if the ALJ had properly addressed Mr. Thompson's opinion. So just any further questions? There do not appear to be additional questions. Thank you for your argument. Thank you, Your Honor. Because Ruth Shuey's credibility was so much subjected to question, it's all the more important that Colin Thompson's statement be given the regard that it is entitled under stout. It was not commented on. It's uncontradicted. It's corroborative. It's cumulative. But it's still probative. I think that's very important. Then with respect to the suicide attempt, even without the Kaiser rule at step two in terms of the special technique, the special technique or the assessment of mental impairments is done in the formation of the residual functional capacity as well between steps three and four. So even there, it gets back to the same colloquy I had with you earlier, Judge Nelson, and that is the significance of the suicide attempt in terms of the residual functional capacity. It was still important there because it's used in a contradictory fashion. It's used to suggest something about her activities of daily living, her interests and her abilities. I still contend, however, that unless we know more about how long it takes, for example, for amitriptyline, especially an overdose of amitriptyline, to flush itself out of the body, I don't know that we should be giving too much stock on her declaration, even the morning after, that she still wanted to go deer hunting. It still could have been the drugs talking so far as we know. I don't know enough about that to be able to speak to that. With respect to the raising sua sponte, Judge Callahan, your question earlier, the issue of adhering or in the decision process, I've been trying to remember there's a case involving obesity where this issue was raised, and I'll try to submit that as a Rule 28J letter where that was commented on. That is where the evidence reasonably raised an issue of obesity as it might impact residual functional capacity, that it was something that should have been regarded even on a sua sponte basis. Thank you. Thank you. This matter will stand submitted. Thank you both for your argument.
judges: Hug, Nelson, Callahan